UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

        v.                                         07 Cr. 329 (SHS)

ELVIS FUENTES,
                    Defendant.
-----------------------------------------------------------x

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF AN ORDER SUPPRESSING PHYSICAL EVIDENCE

JONATHAN MARKS (JM-9696)
Counsel for Defendant
220 Fifth Avenue, Suite 300
New York, NY 10001
Tel: (212) 545-8008

Jonathan Marks
Nelson Farber,
         Of Counsel

# TABLE OF CONTENTS

I. THE HEARING…………………………………………………………………....1

    A. THE GOVERNMENT'S CASE………………………………………………1

        1. TESTIMONY OF NICHOLAS RICIGLIANO…………………………..1

        2. TESTIMONY OF DENNIS TAIT……………………………………...….7

        3. DIRECT EXAMINATION OF KENNETH CROTTY…..………………...8

        4. CROSS EXAMINATION OF CROTTY……………………………………11

    B. THE DEFENSE CASE……………………………………………………......13

        1. TESTIMONY OF VERONICA VEGA……………………………….…..13


I.    ARGUMENT: THE GUNS, AMMUNITION, AND MARIJUNA SEIZED BY
        THE AGENTS SHOULD BE SUPPRESSED……………...……....………......16

  A.    OVERVIEW………………………………………………………………….…...16

  B.    THE COURT SHOULD MAKE A FINDING…………………………………...17
       OF FACT THAT FUENTES CONSENTED ONLY TO THE
       AGENTS' "LOOKING AROUND."

  C.    THE COURT SHOULD MAKE A FINDING OF FACT…………………….…19
       THAT VEGA DID NOT CONSENT TO THE SEARCH UNTIL
       *AFTER* THE GUNS, AMMUNITION AND MARIJUANA HAD
       ALREADY BEEN SEIZED

  D.    THE COURT SHOULD MAKE A CONCLUSION…………………………….24
       OF LAW THAT FUENTES'S CONSENT TO PERMIT THE
       AGENTS TO "LOOK AROUND" WAS NOT A CONSENT TO
       SEARCH AND THE PHYSICAL EVIDENCE SHOULD
       BE SUPPRESSED

        1. THE APPLICABLE LAW…………………………………………………....24

        2. IT WAS NOT OBJECTIVELY REASONABLE…………………………….26
           FOR THE AGENTS TO BELIEVE THAT FUENTES HAD
           CONSENTED TO ANYTHING MORE THAN A SECURITY SWEEP

3.  MOREOVER, CORE FOURTH AMENDMENT PRINCIPLES...............28
    SECURING THE PRIVACY OF ONE'S HOME REQUIRE THAT THE
    SCOPE OF FUENTES'S   CONSENT BE CONSTRUED NARROWLY

E.    CONCLUSION.............................................................................31

# TABLE OF AUTHORITIES

## CASES

Anobile v. Pelligrino,
  274 F.3d 45 (2d Cir. 2001)……………………………………………………16

Cardwell v. Lewis,
  417 U.S. 583, 590, 94 S.Ct. 2464 (1974)……………………………………….29

Florida v. Jimeno,
  500 U.S. 248, 111 S.Ct. 1801 (1991)……………………………………24, 25, 26, 27

Maryland v. Buie,
  494 U.S. 325, 110 S.Ct. 1093 (1990)………………………………...………29, 30

Payton v. New York,
  445 U.S. 573, 100 S.Ct. 1371 (1980)…………………………………...……:..16

Schneckloth v. Bustamonte,
  412 U.S. 218, 93 S.Ct. 2041 (1973)………………………………………………16

State v. Wells,
  539 So.2d 464 (Fla. 1989) aff'd 495 U.S. 1, 110 S.Ct. 1632 (1990)…….................25

United States v. Gandia,
  425 F.3d 255 (2d Cir. 2005)……………………………………………………...30

United States v. Gould,
  364 F.3d 578 (5th Cir.) (en banc), cert. Denied 543 U.S.955, 125 S.Ct. 437 (2004)….....30

United States v Howard,
  ___ F.3d ___, 2007 U.S. App. LEXIS 12927 (2d. Cir. 2007)…………………………..29

United States v. Isiofia,
  370 F.3d 226 (2d Cir. 2004)…………………………………………………...16

United States v. Martinez-Fuerte,
  428 U.S. 543, 96 S.Ct. 3074 (1976)…………………………………………...28

United States v. Mendenhall,
  446 U.S. 544, 100 S.Ct. 1870 (1980)……………………………………….~..16

United States v. Moran Vargas,
2003 U.S. Dist. LEXIS 25738 (E.D.N.Y. 2003), *aff'd* 376 F.3d 112 (2d Cir. 2004).....30

United States v. Snype,
441 F.3d 119 (2d Cir.)................................................................16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

v.                                          07 Cr. 329 (SHS)

ELVIS FUENTES,
                          Defendant.
--------------------------------------------------------x

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF AN
## ORDER SUPPRESSING PHYSICAL EVIDENCE

Defendant Elvis Fuentes submits this Memorandum of Law in support
of his motion suppressing physical evidence seized from his apartment
during an unlawful search on March 20, 2007.

### I.    THE HEARING

On May 31, 2007, the court conducted an evidentiary hearing on
defendant's motion to suppress. The testimony is summarized below.

#### A.    The Government's Case

##### 1.    Testimony of Nicholas Ricigliano

Deputy Marshal Nicholas Ricigliano testified that on the morning of
March 20, 2007, he and two other agents went to Elvis Fuentes's apartment
in the Bronx "to interview him to see if he could tell us where Darius Byrd
[a fugitive] was" (Tr. 6). Ricigliano had no reason to believe that Fuentes
had any involvement with Byrd's case; he had information only that they
were very close associates (Tr. 5). Ricigliano, accompanied by Deputy

1

Dennis Tait, walked into the lobby of an apartment building and knocked on the door to Fuentes's first-floor apartment. He identified himself as the police and asked Fuentes to open the door because "we would like to talk to you" (Tr. 8). Fuentes opened the door and said that they could come in. As the deputies were walking in, Ricigliano had the following exchange with Fuentes:

> I said, Is anybody else in the apartment. He said, Yes. I said, Who? He said, My daughter. I said, Is anybody else? He said, No. I said, Are you sure? He said, Yes. I said, Are there any guns or drugs in the apartment? He said, No. I said, Are you sure? He said, Yes. *I said, Can we look around? He said, Sure, go ahead. (italics supplied)*

Tr. 9.

Ricigliano testified that it was his intention to conduct a security sweep as well as a full search and that he had the right to search based on Fuentes's answering affirmatively the question "Can we look around?" (Tr. 32-33) Ricigliano, in answer to a question by the Court, mischaracterized his request as asking "if we could look around for the guns and the drugs" (Tr. 13). He testified about the exchange with Fuentes on three occasions, and each time he recounted that he asked only "Can we look around" and never if they could look around for guns and drugs (Tr. 9, 21-22, 24).

When the two deputies entered the apartment, they conducted a cursory search "just to make sure that there were no other individuals in

2

there for officer safety reasons" (Tr. 10). A third deputy, Obuchowski, then entered the apartment, and Ricigliano asked Fuentes for his cell phone. He said it was in his car, and he gave his car keys to Obuchwoski and said, "You can go ahead and search it [the car] if you want to" (Tr. 11). The word "search" was used only in connection with an inspection of the car (Tr. 21-22).

Within five minutes of Ricigliano's arrival, while he was talking to Fuentes, other agents arrived. "They came in and they started looking around the apartment" (Tr. 12). Deputy Puri found a small bag of marijuana "*in a dresser* in the back bedroom." Ricigliano also testified that it was "*on top of one of the dressers* in the bedroom." Ricigliano then arrested Fuentes for possession of marijuana and handcuffed him (Tr. 14). Thereafter, Deputies Puri, Witkowich, Turner and maybe one other recovered two guns in a closed dresser drawer (Tr. 14, 30-31). They also found ammunition in the dresser, and marijuana in a closed closet (Tr. 13-14, 30-31).

Ricigliano explained the justification for the search in a colloquy with the Court:

> THE COURT:    Why were they looking around the apartment?
>
> THE WITNESS:  Because Elvis had given – when I initially asked if we could look around for the guns and drugs, I believed that that was, constituted consent.

3

THE COURT:     What were you looking for?

THE WITNESS:   Any possible thing that we could find as far as guns, drugs, a person hiding in the apartment.

THE COURT:     Hadn't that search been done by you when you first came in?

THE WITNESS:   We just did a very brief cursory search.

(Tr. 13).

In further response to the Court's questions, Ricigliano stated that, after Fuentes said that the agents could enter the apartment, the following took place:

THE WITNESS:   Well, the first thing I asked was who else was in the apartment.

THE COURT:     Yes.

THE WITNESS:   And he said, Yes. My daughter. Then I asked, Are you sure? And he said, Yes.

THE COURT:     And then you asked whether there were any guns or drugs and he said no, and then you said can we look around and he said yes.

THE WITNESS:   I said are you sure and he said yes. Then I said, Can we look around? And he said , Yes, go ahead. . . . it was a small enough apartment where we could do a cursory search to make sure there was nobody hiding.

THE COURT:     A safety search?

THE WITNESS:   Right.

4

(Tr. 18-19).

Fuentes's daughter was between three or four years old (Tr. 20).

Ricigliano explained that he asked Fuentes if there were any drugs in the apartment because he hoped that they would either find drugs in plain view or that Fuentes would admit to having drugs and they could then arrest him for drug possession:.

THE COURT:    . . .  Is part of that safety search to see if there are any guns?

THE WITNESS:  Correct.

THE COURT:    I understand why you asked if there are any guns here.  That is for self-protection.  Why did you ask if there were drugs here?

THE WITNESS:  [In other instances] we did not really have warrants for and they [drugs] were in the place in plain view.   It is just our policy, because a lot of people actually will tell you if they have drugs in there and it is helpful if we can arrest somebody who has drugs on them (Tr.  18 – 21).

The witness further testified on cross-examination as follows:

Q.    Deputy, as I understand it, what you are telling us is that you believed that Elvis Fuentes gave      you a consent to search the apartment when in answer to your question can we look around he    said sure, go ahead. Is that correct?

A.    Yes.

(Tr. 24).

*      *      *

5

Q.     Before you asked Elvis Fuentes, as you testified, whether it was OK if you could look around,   did you in any way explain to him what you meant by looking around?

A.     No.

Q.     Actually what you had in mind was looking around to see whether there were any other people   in the apartment, is that correct?

A.     Primarily.

Q.     Primarily.  Because it was a safety search, right?

A.     Yes.

. . .

Q.     Sure.  You said that you did a cursory search, right?

A.     Correct.

Q.     And you also said that you asked Elvis Fuentes if you could look around.

A.     Correct.

Q.     Which happened first?

A.     We asked him if we could look around.

. . .

Q.     You satisfied yourself that you were not in danger?

Q.     Well, you were satisfied enough so that you felt it was fine to just stay in the apartment with Elvis Fuentes?

A.     Correct.

Q.     And not to handcuff him?

A.     Correct.

6

(Tr. 28-29)

Thereafter, Deputies Puri, Witkowich and Turner conducted the search yielding the guns, ammunition, and marijuana (Tr. 30-31).

2.    <u>Testimony of Dennis Tait</u>

Deputy U. S. Marshal Dennis Tate testified that when he and Ricigliano arrived at the apartment, Ricigliano asked Fuentes if there were any other individual or guns or drugs in the apartment. Fuentes said that his daughter was there, that there was nothing in the apartment, and that they could take a look around (Tr. 38-39). The apartment consisted of a small kitchen and living room to the right and a bathroom and back bedroom (Tr. 39). The living room and a small hallway separated the kitchen from the back bedroom (Id.). It took Ricigliano "a minute, if that" to look around the apartment (Id.). After this brief search, Ricigliano and Tait interviewed Fuentes in the living room area (Tr. 39-40). "A few minutes later," other agents arrived (Tr. 40). They asked Ricigliano if the place was "clear." He answered that it was not, and the agents conducted another security sweep. Then Puri found a ziplock bag of marijuana. Ricigliano then handcuffed Fuentes.

Tait further testified that Ricigliano asked Fuentes *again* if there were any other drugs or guns in the apartment, and Fuentes said that *"you can look wherever you want"* (Tr. 41-42). Other marshals then found handguns, ammunition, and a shoebox of marijuana. The ammunition and weapons were in a dresser drawer, and the marijuana was found in a closet (Tr. 42).

### 3. Direct Examination of Kenneth Crotty

Crotty, a Special Agent with ATF, testified that he arrived at the apartment with Deputy U. S. Marshal Bill Dundon in the morning (Tr. 57-59). There were other agents already at the apartment, including Ricigliano, Tait, and several other deputies (Tr. 59). Crotty testified that he received a phone call from Ricigliano, in which he was notified of the situation:

> I was told that they made contact with Elvis Fuentes. When they went into the apartment, he gave a consent to search the apartment. I was told in a bedroom of the apartment they found in plain view a clear plastic bag that contained marijuana. They talked to Mr. Fuentes at that time about if there are any other drugs or guns in the apartment. He stated that there were not. He gave them consent to search the apartment. At that point, they had found a box of ammunition and the first bag of marijuana that was on the dresser.

Id.

When he arrived, Fuentes was in the kitchen, handcuffed, with another deputy (Tr. 60). Most of the other agents were standing around the living room, and one was in the back bedroom, watching Fuentes's daughter

so that she would not hurt herself (Tr. 60). After telling Fuentes that he had heard that a bag of marijuana had been found, Crotty asked Fuentes if there were any other drugs or guns in the apartment. Fuentes replied that there were none and that he had told the other guys that were there that they could look (Tr. 61).

Crotty further testified that Veronica Vega showed up approximately 15 minutes after he arrived (Tr. 61). Crotty spoke to her outside of the apartment door in the hallway (Tr. 62). Vega was already speaking with a U.S. Marshal and "during that time she gave consent to search the apartment" (Tr. 62). One of the other marshals said they were going out to the car to get a consent form (Tr. 62). Crotty asked Vega if she knew Darius Byrd, or anything about him, and she stated that she did not (Tr. 62). At this point, one of the marshals showed up with the form, and while Ms. Vega began filling it out, Crotty walked into the back bedroom of the apartment where Ricigliano and Puri were (Tr. 62).

After Crotty went back into the apartment, a further search took place (Tr. 62). He told Ricigliano and Puri that "his [Fuentes's] wife had shown up and she had also given consent to search the apartment" (Tr. 62). At this point, the agents found a hidden drawer:

> They were showing me a box of ammunition they found in one of the dresser drawers. The top molding around the dresser moved when they leaned on it. They pulled out this drawer and inside there were two firearms, ammunition, I believe to be a large sum of money and a document with the name of Elvis Fuentes and what I perceived as packaging material for narcotics were in that drawer.

Tr. 63.

The dresser had "four drawers and then it had molding going around the top of the dresser. That molding actually pulled out and was a drawer that had the depth of, say, 3 to 4 inches" (Id.).

Crotty then went out to the hallway and told Vega that they had already found several guns within arms' reach of her daughter (Tr. 63). After informing her of the dangers that the guns posed, Crotty brought her into the bedroom and asked her to point out which drawers were hers and which were Elvis's (Tr. 63). She pointed to a small drawer and said that was mainly for her clothing and that of the children, and that in the tall dresser, where the guns had been found, the bottom two drawers were hers, and the top two were Elvis's (Tr. 63-64). She told him she never knew that the drawer in the molding opened (Tr. 64).

In the bedroom there was a closet, and on the floor there was a safe (Tr. 65). When the agents asked Ms. Vega about the safe, she stated that she did not know the combination (Tr. 65). Ms. Vega then got the keys to open

the safe. The safe contained several boxes of ammunition but no guns (Tr. 66).

Crotty testified that he was inside the apartment for a total of between an hour and a half and two hours. Fifteen to twenty minutes were spent searching and the remainder of the time was spent waiting for detectives to arrive and for Vega to return with the dog (Tr. 67).

### 4.    Cross Examination of Crotty

Crotty received a phone call from Ricigliano when he was in the vicinity of East Gun Hill Road; approximately five minutes passed until he arrived at the apartment (Tr. 70-71). He testified that Veronica Vega had not yet arrived but was en route (Tr. 71). Between 15 and 20 minutes passed before Vega arrived, and during that time Crotty spoke with Fuentes and deputy Ricigliano and contacted some NYPD detectives over the phone (Tr. 72).

Deputy Puri was in the back bedroom with Mr. Fuentes's daughter (Tr. 72). By this point, the ziplock bag of marijuana and a box of .40 caliber ammunition had been found (Tr. 73-74). The bag was on top of a dresser in the bedroom (Tr. 74). The box of ammunition was found in a dresser drawer (Tr. 73).

11

When Vega arrived, one of the other deputy marshals asked her if she would give consent to search the apartment, and Crotty asked it again. She answered, "Yes" (Tr. 73). It never occurred to Crotty that somebody might challenge the constitutionality of the search (Tr. 75).

Crotty also prepared a report [dated March 26, 2007], which included a chronological account of the events of March 20, 2007 (Tr. 77). He testified as follows:

> Q. . . . Well, which happened first, sir? Did she give this oral consent to search before you found these items that are enumerated [including the guns] or after?
>
> A. She gave oral consent and then we found all the, that which you just described.
>
> Q. Can you tell us, sir, why [in the report] you used the phrase "during that time" rather than saying subsequently?
>
> A. Sir, that's just the way I wrote it.
>
> Q. I see. Is that what you meant, subsequently, when you said during that time?
>
> A. No, I just meant during that time. She gave consent and then we searched the place.
> B.
> Q. But it doesn't say that, does it?
>
> A. I take it as it does state that. Vega arrived at the location and spoke with task force members outside the apartment giving oral consent. Then I say during that time, meaning afterwards, that we found those items.
>
> Q. During that time means afterwards. Is that your testimony, sir?

A.    Sir, I'm just stating that—

Q.    *Did you just tell us, sir, that during that time means afterwards?*
A.    *Yes.*

Tr. 78-80

When Crotty went in to search, they were filling out the consent form

(Tr. 80).

B.    The Defense Case

1.    Testimony of Veronica Vega

Veronica Vega and Elvis Fuentes have been living together for approximately a year and a half, although he does not stay in her apartment continuously (Tr. 85). She has worked at  Columbia Law School for ten years  and is production coordinator and acting manager of the secretariat (Tr. 85- 87).

On the morning of March 20th, Vega called Fuentes on his cellular phone (Tr. 86). Someone other than Fuentes answered the phone and told her to come home immediately (Tr. 87). Once she arrived, she found a federal agent with white hair standing in the hallway (Tr. 88). He asked her whether she recognized Tucci, and showed her a photograph. Vega did not recognize him (Tr. 88).

The agent then told Vega to sit tight, as they were waiting for "the big guy" to come (Tr. 88). He then asked Ms. Vega if she knows of anything in the apartment that should not be there, and she answered no (Tr. 88). The agent told her that they had found "a couple of guns and some marijuana" (Tr. 88-89).

Vega later learned that "the big guy" was Ken Crotty (Tr. 90). She first saw Agent Crotty as he was entering the building while she was in the hallway speaking with the gray-haired agent approximately 10 to 15 minutes after she had arrived. Agent Crotty was walking *into* the building from outside, and he went to speak with the white-haired agent. Then he went inside the apartment, and when he came out, he and then the other agent asked Vega if she would have a problem signing a consent form so that they could continue to search the apartment. She signed the form, and then was able to go into the apartment (Tr. 91). Crotty had come back out of the apartment and was present when she signed the consent form (Tr. 94-95). Prior to that, no one had asked her if she would consent to a search of the apartment (Tr. 92). She is certain that she was informed about the guns and marijuana prior to signing the consent form (Tr. 93).

On cross-examination, she testified as follows: Agent Crotty walked in by himself, and the only other individual in the hallway was the agent

14

with the white hair (Tr. 93-94). Prior to signing the consent form, the other agent told Vega that they had found two guns and marijuana (Tr. 94).

Vega did not know how to open the safe in the bedroom closet (Tr. 95). She saw agents using a key and "trying to mess with the keypad," and one of them asked Vega to go to Elvis and to tell him to give them the code (Tr. 95). She went to the kitchen and Elvis told her that he did not remember it, and she told this to the agents (Tr. 95-96). Then she saw them "messing with some keys" and then an agent said, "We got it" (Tr. 96).

Vega has known Fuentes for five years; he is her boyfriend and the father of her daughter (Tr. 97). He stays in her apartment two to three days a week and keeps his personal belongings there (Tr. 97).

**ARGUMENT**

## I. THE GUNS, AMMUNITION, AND MARIJUNA SEIZED BY THE AGENTS SHOULD BE SUPPRESSED

A    OVERVIEW

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380 (1980). As the government lacked a warrant to search Fuentes's apartment, it bears the burden of proving by a preponderance of the evidence on this suppression motion that the search was lawful under an exception to the warrant requirement. *See United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879 (1980); *United States v. Snype*, 441 F.3d 119, 131 (2d Cir.), cert. den. ____ U.S. ____, 127 S.Ct. 285 (2006); *United Stats v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004).

"One of the specifically established exceptions to the requirement of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44 (1973). *See also Anobile v. Pelligrino*, 274 F.3d 45, 61 (2d Cir. 2001). Here, the government argues that Fuentes consented orally to the search that yielded the guns, ammunition and

16

marijuana. The government further contends that Vega consented both orally and by signing a consent form. For the following reasons, they are incorrect.

> B. THE COURT SHOULD MAKE A FINDING OF FACT THAT FUENTES CONSENTED ONLY TO THE AGENTS' "LOOKING AROUND."

The Facts

As detailed in the Hearing Testimony above, the only credible account of the circumstances leading up to the search came from Deputy Marshal Ricigliano. He testified that the search was predicated on the following exchange he had with Fuentes:

THE WITNESS: Well, the first thing I asked was who else was in the apartment.

     THE COURT:     Yes.

     THE WITNESS:     And he said, Yes. My daughter. Then I asked, Are you sure? And he said, Yes.

     THE COURT:     And then you asked whether there were any guns or drugs and he said no, and then you said can we look around and he said yes.

     THE WITNESS:     I said are you sure and he said yes. Then I said, Can we look around? And he said , Yes, go ahead. . . . it was a small enough apartment where we could do a cursory search to make sure there was nobody hiding.

     THE COURT:     A safety search?

     THE WITNESS:     Right.

(Tr. 18-19).

Ricigliano explained that he believed that Elvis Fuentes gave consent to search when in answer to the question, "Can we look around? He said, "Sure, go ahead" (Tr. 24). Ricigliano never asked if they could look around for drugs. He described the inquiry leading up to the search as follows:

> I told him what my name was and I asked if we could come in and talk to him, and he said sure. So we started walking in and then I said, Is anybody else in the apartment? He said, Yes. I said, Who? He said, My daughter. I said, Is anybody else? He said, No. I said, Are you sure? He said, Yes. Is said, Are there any guns or drugs in the apartment? He said, No. I said, Are you sure? He said, Yes. I said, Can we look around? He said, Sure, go ahead.

Tr. 9.

This was the only exchange that Ricigliano testified to concerning a search of the apartment. Tait's testimony is to the contrary. He claimed that while he and Ricigliano were interviewing Fuentes in the kitchen, other deputies came into the apartment and asked Ricigliano a question, which Tait could not hear but took to be a query as to whether the apartment was clear (Tr. 40). According to Tait, Ricigliano said that the apartment was not clear (even though he had already conducted a security sweep and was already interviewing Fuentes) and the deputies proceeded to search the apartment (Tr. 40). Tait further testified that after Ricigliano handcuffed Fuentes and arrested him for possession of marijuana that Puri

18

had found, Ricigliano asked Fuentes *a second time* if there were any guns or drugs in the apartment and that Fuentes said "you can look wherever you want (Tr. 42).

This testimony is not only contrary to Ricigliano's version of events but is inherently implausible. Upon first entering the apartment, Ricigliano asked Fuentes if there was anybody else there and if there were any guns or drugs present (Tr. 9). Fuentes consented to their looking around, and Ricigliano and Tait conducted a security sweep but did not find anybody else or any guns or drugs (Tr. 9-10). According to Tait, while he and Ricigliano were interviewing Fuentes, other deputies arrived, and Ricigliano asked the very same questions all over again even though Ricigliano had satisfied himself that it was safe to interview Fuentes without handcuffing him. Ricigliano had no reason to ask Fuentes a second time (Tr. 42). Tait's testimony should not be credited.

> C.   THE COURT SHOULD MAKE A FINDING OF FACT THAT VEGA DID NOT CONSENT TO THE SEARCH UNTIL *AFTER* THE GUNS, AMMUNITION AND MARIJUANA HAD ALREADY BEEN SEIZED

Veronica Vega testified in a completely straightforward and credible manner. When she arrived at the building, she was stopped in the hallway outside of her apartment by a white-haired agent, who told her that they

were waiting for "the big guy," whom she later learned was Crotty. The agent told her that they had found a couple of guns and marijuana in the apartment. Ten or fifteen minutes after she arrived, Crotty entered the building and went into the apartment (Tr. 90). When he came back to the hallway, the white-haired agent, and then Crotty, asked Vega if she would sign a consent to search form so they could continue searching. She readily signed it. Vega stated that there was no doubt that the agent told her that they had found guns and marijuana *before* she consented to the search. It is respectfully submitted that the court should credit her testimony.

Agent Kenneth Crotty of ATF gave incredible testimony at odds with the other testimony at the hearing. He testified that he arrived at the apartment approximately five minutes after receiving information that Ricigliano had made contact with Fuentes (Tr. 70-71) and fifteen minutes *before* Vega arrived and that the search producing the guns did not take place until after Vega had signed a consent to search form (Tr. 61 - 62), i.e., more than 20 minutes after Ricigliano and Tait arrived, and after Crotty himself had arrived. Indeed, according to Crotty's account, the deputies who found the guns would have been waiting around doing nothing for at least 20 minutes before Vega arrived and consented to the

search. He said that he told Ricigliano and Puri that Vega had consented to the search and only after that did they find the guns (Tr. 62-63). Ricigliano said nothing about Vega in explaining why he believed it was a proper to conduct a search. He mentioned only Fuentes's consent to their looking around as a justification for the search (Tr. 13).

Ricigliano, in contrast to Crotty, testified that Puri and his group arrived no later than five minutes after Ricigliano and Tait got there. Puri and the others came in and started looking around the apartment, and Puri found marijuana. Fuentes was handcuffed a minute or so later (Tr. 13-14). At that point, deputies conducted a more extensive search and found the guns, ammunition, and cash in a dresser drawer (Tr. 14).

Neither Ricigliano nor Tait testified that there was a break while they waited for Vega's consent. In response to a question by the Court, Ricigliano testified that the deputies were looking around the apartment because "when I initially asked if we could look around for the guns and drugs, I believed that that was, constituted consent." They were looking for "any possible thing that we could find . . ." (Tr. 13).

Crotty's testimony also contradicted Tait's. Tait testified that after they arrived, Ricigliano looked around the rest of the apartment while Tait stayed with Fuentes in the living room, Ricigliano returned after "maybe a

minute, if that" (Tr. 39), Crotty began interviewing Fuentes, "a few minutes later other agents arrived" (Tr. 40).    Puri found a bag of marijuana, and Ricigliano handcuffed Fuentes (Tr. 41).

Crotty further testified to a conversation which, he stated, Ricigliano had with Fuentes, which Ricigliano himself never testified about.    Tait testified that after he was handcuffed, Fuentes told Ricigliano that "you can look wherever you want," and there was a further search yielding the handguns" (Tr. 42).

In contrast to the testimony of Crotty that the agents waited for Vega to consent to the search, Tait testified that the search took about 15 minutes and that the rest of time was spent "trying to get out of the apartment and finish up what we were doing" (Tr. 44).

Crotty contradicted Ricigliano and Tait's account of the events when he claimed that there was a hiatus of at least 20 minutes from the time Ricigliano and Tait arrived to the time the handguns were found  (Tr. 61-62).    Were Crotty's testimony accurate, the search could not have taken place until Crotty arrived (five minutes after Ricigliano and Tait) and after Vega arrived (15 minutes after Crotty).

Ricigliano said that Fuentes was handcuffed and after that point the search yielding the handguns took  place (Tr. 14).    Tait also testified that

22

after Fuentes was handcuffed, he consented to the search, and, on that basis, Puri conducted a search yielding the handguns in a dresser drawer (Tr. 42, 52-54). Neither Ricigliano nor Tait testified that they waited until Vega consented before conducting the search. They both said that it was Fuentes who consented to the search.

Crotty said that he was present during the search of the dresser (Tr. 62). However, Ricigliano said that the search was conducted by "Puri, Witkowich, Turner, and there may have been one other guy." He did not mention Crotty, who was sitting at counsel table during Ricigliano's testimony" (Tr. 30).

Given the conflicts with the testimony of Ricigliano, Tait, and Vega and the implausibility that the agents would have sat around waiting for Vega to arrive before conducting the search, the testimony of Crotty that Vega consented to the search before the guns, ammunition, and second quantity of marijuana were found should be rejected.

D.   THE COURT SHOULD MAKE A CONCLUSION OF
     LAW THAT FUENTES'S CONSENT TO PERMIT
     THE AGENTS TO "LOOK AROUND" WAS NOT A
     CONSENT TO SEARCH AND THE PHYSICAL
     EVIDENCE SHOULD BE SUPPRESSED.

1.   The Applicable Law

"The standard for measuring the scope of the suspect's consent under the Fourth Amendment is that of an objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803-04 (1991).

Interpreting *Jimeno*, the Second Circuit has ruled that "[o]f course, this objective standard does not preclude an assessment of the particularities of the situation that is presented in any given case[;] on the contrary, it is still the totality of the circumstances that must be considered." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041 (1973) (establishing "totality of the circumstances" test).

The case law addressing the issue of "consent" under the Fourth Amendment falls into two broad categories – the voluntariness of the

24

consent (*see e.g. Schneckloth,* supra) and the scope of the consent, with most cases addressing the former issue. *Jimeno, supra,* addressed the "scope of consent" issue, albeit, in a factual setting distinct from the instant case.

In *Jimeno*, a Florida police officer, Trujillo pretextually stopped Jimeno's car for a traffic infraction, believing he might find drugs. Trujillo asked Jimeno if he could search, expressly informing him that he would be looking for narcotics. Jimeno consented, and Trujillo found cocaine in a brown paper bag on the floorboard. *Jimeno*, 500 U.S. at 249-252, 111 S.Ct. at 1803-1804.

Rejecting Jimeno's argument that his consent to search the car did not authorize the opening of the bag, the Court ruled that: (1) Jimeno did not place a limit on the scope of the search; and (2) it was objectively reasonable for the officer to believe that Jimeno had consented to a search of the bag as Jimeno knew that drugs were being searched for and that drugs are generally carried in some form of a container, such as a paper bag. *Id.*, 500 U.S. at 251, 111 S.Ct. at 1804.

The *Jimeno* Court distinguished its conclusion from that reached by the Florida Supreme Court in *State v. Wells*, 539 So.2d 464 (1989), aff'd on other grounds, 495 U.S. 1, 110 S.Ct. 1632 (1990). In *Wells*, the Florida Supreme Court ruled that consent to search a car's trunk did not

25

authorize the search of a locked briefcase found in the trunk. The *Jimeno* Court stated that "[i]t is very likely unreasonably to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." *Jimeno*, 500 U.S. at 251-52, 111 S.Ct. at 1804.

> 2.   It was not Objectively Reasonable for the Agents to Believe that Fuentes had Consented to Anything More than a Security Sweep

A typical reasonable person would believe that the exchange between Ricigliano and Fuentes constituted no more than a consent to perform a security sweep or cursory search to protect the agents' safety, not a full search of the premises. Indeed, Ricigliano himself did not believe that Fuentes had consented to anything more than a look around to see what was in plain view. He explained that the reason he asked Fuentes if there were any drugs in the apartment was that on earlier occasions "we did not really have warrants for [drugs] and they were in the place in plain view" and some people admitted to possession of drugs. Implicit in this explanation is Ricigliano's belief that all he was authorized to do was to look around for things in plain view, not in closed drawers (Tr. 21).

On yet another occasion, Ricigliano expressly conceded that what he had in mind was performing a safety search.

26

Q. Actually, what you had in mind was looking around to see whether there were any other people in the apartment, is that correct?

A.    Primarily.

Q.    Primarily.  Because it was a safety search, right?

A.    Yes.

(Tr. 28).

In addition, Ricigliano made a distinction between a search and just looking around.   Thus, he conceded that Fuentes used the word "search" in connection with his car but gave the agents consent only "to look around" the apartment (Tr. 21-22).

Significantly, Ricigliano's testimony that "I initially asked if we could look around for the guns and drugs" (Tr. 13) is an inaccurate characterization of his exchange with Fuentes.   He never asked Fuentes that.   He asked  only (1) if there was anyone else there,  (2) if there were any guns or drugs, and (3) if they could look around.

It was not objectively reasonable for the agents to conclude that Fuentes had consented to a search of compartments not in plain view.   First, unlike the officer in *Jimeno*, the agents in this case did not ask for permission to "search."   The term "search" connotes elements of

27

thoroughness and invasiveness. According to one popular on-line reference source, dictionary.com, the word "search" means:

(Definition #1)
"to go or look through (a place, area, etc.) carefully in order to find something missing or lost: *They searched the woods for the missing child. I searched the desk for the letter."*
(italics original)

(Definition #2)
"to look at or examine (a person, object, etc.) carefully in order to find something concealed: *He searched the vase for signs of a crack. The police searched the suspect for weapons."* (italics original).

By contrast, a reasonable person would understand that when the agents were asking for permission to "look around," they wanted to insure themselves of their safety, not to look in drawers in rooms far removed from where they would interview Fuentes.

> 3.  Moreover, Core Fourth Amendment Principles Securing the Privacy of One's Home Require that the Scope of Fuentes's Consent be Construed Narrowly

"[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York, supra,* 445 U.S. at 585-86, 100 S.Ct. at 1379-80. Thus, "the sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection[.]" *United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3075 (1976).

By contrast, an automobile search, such as the one carried out in *Jimeno, supra,* does not implicate the Fourth Amendment to the same degree, given that one has less of an expectation of privacy in one's vehicle as compared to the home. *See Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464 (1974); *United States v. Howard,* ____ F.3d ____, 2007 U.S. App. LEXIS 12927, *17-19 (2d Cir. 2007). *Jimeno* involved a search in which there was a diminished expectation of privacy, rendering that case legally distinct from this one.

The Fourth Amendment limits the liberal construction of consent urged by the government in this case. As noted recently by the Second Circuit, in the context of discussing whether protective sweeps are permissible absent arrest (an issue left unresolved in the decision):

> Although we do not decide the issue, we do note that when police have gained access to a suspect's home through his or her consent, there is a concern that generously construing *Buie* [*Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093 (1990)] will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home. As the Fifth Circuit, sitting en banc, recently recognized: ["]Protective sweeps following a consent entry may in certain circumstance pose Fourth Amendment concerns not present in cases where the initial entry is pursuant to a warrant. For example, concerns might arise respecting a consent to entry requested for a stated common purpose of gaining access in order to then make a protective sweep of the entire

29

home for unrelated reasons and thus circumvent
the warrant requirement.["]

*United States v. Gandia*, 424 F.3d 255, 262-63 (2d Cir. 2005) *quoting*

*United States v. Gould*, 364 F.3d 578, 589 (5th Cir.) (en banc), cert. denied

543 U.S. 955, 125 S.Ct. 437 (2004). *See also United States v. Moran*

*Vargas,* 2003 U.S. Dist. LEXIS 25738 (E.D.N.Y. 2003), *aff'd* 376 F.3d 112

(2d Cir. 2004) (finding that protective sweep not justified unless incident to

arrest).

The concerns raised in *Gandia* are at least equally applicable

here, but in a somewhat different context. The *Gandia* scenario involves a

consent entry, followed by the agents conducting a protective sweep -- i.e., a

search of "closets and other spaces immediately adjoining" the area where

the occupant is present. *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct.

1093, 1098 (1990). (The open issue in this Circuit after *Buie* is whether

protective sweeps are allowed even if an arrest is not made.)

Here, the agents asked for consent to enter and, once inside,

conduct a security sweep. The search they actually conducted far exceeded

the scope of a Buie-type protective sweep, insofar as dresser drawers far

outside of Fuentes's reach and field of vision were searched. The Fourth

30

Amendment requires a far clearer "consent" than the vague  authorization, following questions going to the agents' safety,  to "look around." [1]

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress should be granted in its entirety.

/s/ J Marks
JONATHAN MARKS (JM-9696)
Counsel for Defendant
220 Fifth Avenue, Suite 300
New York, NY 10001
Tel: (212) 545-8008

Jonathan Marks
Nelson Farber,
    Of Counsel

---

[1] Further, even were the government to argue that the guns and ammunition  were properly seized incident to Fuentes's arrest for possession of marijuana allegedly seized in plain view (which Fuentes disputes), such position would be unavailing, as: (1) the  dresser drawers were not grabable areas posing a threat to the agents, and thus, a protective search was unjustified; and (2) a warrant to search the dresser drawers had not been secured.