UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

        -v.-                       :          07 Cr. 329 (SHS)

ELVIS FUENTES,                     :

                 :

          Defendant.             :
- - - - - - - - - - - - - - - - x


**GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
     of America.


Jessica A. Masella
Assistant United States Attorney
   - Of Counsel -

## Table of Contents

The Evidence At The Hearing . . . . . . . . . . . . . . . . . 3

Discussion   . . . . . . . . . . . . . . . . . . . . . . 10

The Search Of Fuentes's Apartment Was Proper   . . . . . . . . 10

A.   Legal Standards . . . . . . . . . . . . . . . . . . . 10

B.   Fuentes Consented To The Search Of His Apartment . . . . 12

C.   Vega Provided Additional Consent For The Search   . . . . 18

D.   Fuentes's Consent Was Voluntary   . . . . . . . . . . . 21


Conclusion   . . . . . . . . . . . . . . . . . . . . . 22

## Table of Authorities

**Cases**                                                                      **Page(s)**

*Bumper* v. *North Carolina*,
    391 U.S. 543 (1968) . . . . . . . . . . . . . . . . . . . 12

*Florida* v. *Jimeno*,
    500 U.S. 248 (1991) . . . . . . . . . . . . . . . . . . . 11

*Katz* v. *United States*,
    389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . 10

*Krause* v. *Penny*,
    837 F.2d 595 (2d Cir. 1988) . . . . . . . . . . . . . . 11

*Maryland* v. *Dyson*,
    527 U.S. 465 (1999) . . . . . . . . . . . . . . . . . . . 10

*Schneckloth* v. *Bustamonte*,
    412 U.S. 218 (1973) . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Al Marri*,
    230 F. Supp. 2d 530 (S.D.N.Y. 2002) . . . . . . . . . . 16

*United States* v. *Anderson*,
    2005 WL 497778 (S.D.N.Y. March 3, 2005) (JFK) . . . . . 14

*United States* v. *Arango-Correa*,
    851 F.2d 54 (2d Cir. 1988) . . . . . . . . . . . . . . . 12

*United States* v. *Carreno-Arias*,
    2002 WL 31890949 (S.D.N.Y. Dec. 27, 2002) (WHP) . . . . 14

*United States* v. *Garcia*,
    56 F.3d 418 (2d Cir. 1995) . . . . . . . . . 10-11, 12, 21

*United States* v. *Juliano*,
    2000 WL 1206745 (S.D.N.Y. 2000) . . . . . . . . . . . . 18

*United States* v. *Lavan*,
    10 F. Supp. 2d 377 (S.D.N.Y. 1998) . . . . . . . . . 11-12

*United States* v. *Lee*,
    1996 WL 391877 (S.D.N.Y. July 12, 1996) (RPP) . . . . . 14

*United States* v. *Padilla*,
    986 F. Supp. 163 (S.D.N.Y. 1997) . . . . . . . . . . . . 13

*United States* v. *Weidul*,
    325 F.3d 50 (1st Cir. 2003)   . . . . . . . . . . . . . 12

*United States* v. *Yu-Leung*,
    910 F.2d 33 (2d Cir. 1990) . . . . . . . . . . . . . . 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          -v.-                    :          07 Cr. 329 (SHS)

ELVIS FUENTES,                    :

                                 :
          Defendant.
                                 :
- - - - - - - - - - - - - - - - x


**GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

          The Government respectfully submits this Memorandum of

Law in opposition to defendant Elvis Fuentes's motion to suppress

physical evidence recovered by agents with the Bureau of Alcohol,

Tobacco, Firearms and Explosives (the "ATF") and the United

States Marshals Service (the "USMS") during and after a search of

his apartment on March 20, 2007, in connection with his arrest

for possession of two loaded guns, several boxes of ammunition,

and marijuana and marijuana packaging materials that day.

Fuentes's motion should be denied in its entirety in light of the

evidence set forth during the May 31, 2007 hearing because the

gun, ammunition, marijuana, and other evidence were recovered

only after Fuentes gave the USMS and ATF agents consent to enter

and search his apartment.  The evidence at the hearing

demonstrated that Fuentes voluntarily consented to the search of

his apartment, and that his consent was unequivocal and without

limitation.  In addition, when Fuentes's common law wife returned

home, she gave her consent for the search of the apartment.

## The Evidence At The Hearing

During the morning hours of March 20, 2007, Deputy United States Marshals Nicholas Ricigliano and Dennis Tait went to an apartment where Elvis Fuentes was staying, located at 282 East Gun Hill Road in the Bronx, New York.  (Tr. 4-7 (Ricigliano); 35-37 (Tait)).[1]  Ricigliano and Tait, who work on the Warrant Squad of the New York/New Jersey Regional Fugitive Task Force, were conducting an investigation to locate Darius Byrd, a/k/a "Toochie," an individual who was the subject of an outstanding arrest warrant issued in the Southern District of New York for, among other things, racketeering.  (Tr. 4-5 (Ricigliano); 35-36 (Tait)).  Ricigliano and Tait went to the East Gun Hill Road apartment to interview Fuentes, because they had information that Fuentes had been in recent contact with Byrd, and was an associate of Byrd's.  (Tr. 5 (Ricigliano); 37 (Tait)).  Based on information that they had gathered before going to the apartment, Ricigliano and Tait were aware that Fuentes had a criminal history for drug possession charges, although they did not have any reason to believe that Fuentes was involved with the charges underlying Byrd's indictment.  (Tr. 5-6 (Ricigliano); 36 (Tait)).

---

[1] References to "Tr." are to the transcript of the May 31, 2007 evidentiary hearing in this matter.

3

Ricigliano, Tait, and Deputy United States Marshal Bart Obuchowski arrived at 282 East Gun Hill Road in the mid-morning hours of March 20, 2007. (Tr. 7 (Ricigliano); 37 (Tait)). When they got to the apartment, which was located on the first floor, Ricigliano knocked on the door and identified himself as police. (Tr. 8 (Ricigliano); 38 (Tait)). Tait was standing next to him and Obuchowski was outside near the back of the building. (Tr. 8 (Ricigliano); 37-38 (Tait)).

Fuentes opened the door to the apartment and Ricigliano and Tait further identified themselves, showing him their credentials, to identify themselves as members of the USMS. (Tr. 9 (Ricigliano); 38 (Tait)). Ricigliano asked Fuentes if they could enter the apartment to speak with him. (Tr. 9 (Ricigliano); 38 (Tait)). When Fuentes agreed that they could come into the apartment, Ricigliano asked Fuentes if there was anybody else at home, to which Fuentes replied that only his daughter was home. (Tr. 9 (Ricigliano); 38 (Tait)). Ricigliano then asked Fuentes "are there any guns or drugs in the apartment?" and, when Fuentes replied "no," Ricigliano said "can we look around?" (Tr. 9 (Ricigliano); 38 (Tait)). Fuentes told the agents to go ahead and look around. (Tr. 9 (Ricigliano); 39 (Tait)). Ricigliano understood that Fuentes had given his consent for the agents to look around for "[a]ny possible thing that we could find as far as guns, drugs, a person hiding in the

4

apartment." (Tr. 13 (Ricigliano)).

Once inside the apartment, Ricigliano did a brief, cursory search of the apartment. (Tr. 10 (Ricigliano); 39 (Tait)). A short time later, Obuchowski came into the apartment. (Tr. 10-11 (Ricigliano)). At that time, Ricigliano asked Fuentes about his cellphone. (Tr. 11 (Ricigliano); 43 (Tait)). After Fuentes told the agents that his cellphone was in his car, Ricigliano asked him if they could have the keys to his car. (Tr. 11 (Ricigliano); 43 (Tait)). Fuentes gave the car keys to Obuchowski, described where the car was parked, and told the agents "you can go ahead and search [the car] if you want to." (Tr. 11 (Ricigliano)). Ricigliano continued to talk with Fuentes about the whereabouts of Darius Byrd. (Tr. 12 (Ricigliano); 40 (Tait)).

A few minutes later, additional agents with the USMS arrived, including Deputy United States Marshal Manny Puri. The other agents continued to look around the apartment, while Ricigliano talked to Fuentes, and Puri found a small bag of marijuana on top of a dresser in the bedroom. (Tr. 13 (Ricigliano); 41 (Tait)). At that point, the agents put handcuffs on Fuentes, (Tr. 14 (Ricigliano); 42 (Tait)), and Ricigliano asked Fuentes again if they could look around the apartment, to which Fuentes replied, "you can look wherever you want, there's nothing in the apartment." (Tr. 42 (Tait)).

5

At some point after the marijuana was found and after Fuentes was placed in handcuffs, Special Agent Kenneth Crotty of the ATF arrived at the apartment. (Tr. 59-60 (Crotty)). By the time that Crotty arrived at the apartment, he had spoken with Ricigliano, who told him that Fuentes had given the agents consent to search the apartment and that they had found a box of ammunition and a bag of marijuana. (Tr. 59 (Crotty)). When Crotty arrived at the apartment, he spoke with Fuentes, who was in the kitchen. (Tr. 60 (Crotty)). After identifying himself and telling Fuentes that he was being detained, but not arrested, at that time, Crotty asked Fuentes if there were any other drugs or guns in the apartment. (Tr. 61 (Crotty)). Fuentes replied that there were not, and that he had already "told the other guys that were there that they could look." (Tr. 61 (Crotty)).

The agents then conducted a further search of the apartment. (Tr. 14-15 (Ricigliano); 42 (Tait)). They found, among other things, two loaded guns and a large sum of cash (inside a dresser drawer), several boxes of ammunition (inside a dresser drawer), a box of marijuana (in the hallway closet), and some additional boxes of ammunition (from inside a safe in the hallway closet). (Tr. 14-15 (Ricigliano); Crotty (62-65)). The agents opened the safe with the assistance of Veronica Vega, Fuentes's common law wife, who returned home at some point while the agents were there. (Tr. 15 (Ricigliano); 43-44 (Tait); 65

6

(Crotty)).[2]

When Vega arrived at the apartment building, she spoke with Crotty and another agent in the hallway outside the door to her apartment. (Tr. 61-61 (Crotty); 88 (Vega)). During that conversation, Vega gave her oral consent for the agents to search the apartment and she stated that should would not mind signing a form indicating her consent. (Tr. 62 (Crotty); 91 (Vega)). Vega subsequently did sign a consent form indicating her consent for the agents to search the apartment. (Tr. 62 (Crotty); 91 (Vega); GX 1).

Crotty testified that Vega gave her consent for the search after the agents had found one box of ammunition and the small bag of marijuana, but before the agents found the loaded guns, cash, additional ammunition and the large bag of marijuana. (Tr. 62-64 (Crotty)). Specifically, Crotty testified that, after he spoke with Vega in the hallway regarding her consent for the search, he first went into the apartment, then the loaded guns were found in a dresser drawer in the bedroom, then he returned to the hallway to speak with Vega so that she could return to the bedroom and take care of her daughter, who was playing in the bedroom in proximity to the guns. (Tr. 62-64 (Crotty)). Vega

---

[2] While Vega states that she did not help the agents to open the safe, she does recall that she was in the bedroom while the agents were opening the safe, and that she attempted to help open the safe by asking Fuentes for the code, as requested by the agents. (Tr. 95 (Vega)).

described a slightly different chronology of events.  She testified that, at the time she gave her consent for the search, the agents told her that they had already found the guns.  (Tr. 88-89 (Vega)).  In any event, all of the evidence is consistent that at some point Vega did give both her oral and written consent for the search, and, subsequently, she assisted the agents in their search by pointing out which dresser drawers belonged to Fuentes and by helping to open the safe.  Tr. 15 (Ricigliano); 43-44 (Tait); 63-65 (Crotty)).

After the guns, ammunition, cash and marijuana were were found, Fuentes was arrested and taken to a New York City Police Department precinct for arrest processing.  (Tr. 16 (Ricigliano); 67 (Crotty)).  The agents were in Fuentes's apartment for approximately an hour and a half or two hours, although they were only conducting a search for approximately ten to fifteen minutes.  (Tr. 44 (Tait); 67 (Crotty)).[3]  Fuentes was present for the entire search and for the entire time that the agents were in his apartment.  (Tr. 16 (Ricigliano); 44 (Tait); 67 (Crotty)).  Fuentes never told the agents to stop searching the apartment, and never limited the scope of their search.  (Tr. 16-17 (Ricigliano); 68 (Crotty)).  The agents never used any

_____

[3] For the remainder of the time, the agents were generally talking to Fuentes and waiting for additional agents to arrive to process the arrest evidence and fingerprint Fuentes.  (Tr. 44 (Tait); 67 (Crotty)).

threats or promises to obtain Fuentes's consent for a search, nor did the agents ever tell Fuentes that they could get a search warrant. (Tr. 17-18 (Ricigliano); 45-46 (Tait); 68 (Crotty)). The agents never told Fuentes that they were going to start "breaking everything" and they never said "we're feds, we can do whatever we want." (Tr. 17 (Ricigliano); 45 (Tait); 68 (Crotty)).

Before the day of his arrest, none of the agents had focused on Fuentes as a target of their investigation. Instead, Ricigliano and Tait, who were assigned to locate the fugitive Darius Byrd, identified Fuentes as a likely source of information about Byrd. (Tr. 6 (Ricigliano); 36-37 (Tait)). Ricigliano and Tait became aware of Fuentes only a short time before March 20, 2007, and neither Ricigliano nor Tait had any continuing role with respect to Fuentes after the day of his arrest. (Tr. 6 (Ricigliano); 36-37 (Tait)). Crotty was involved with the investigation because he is one of the case agents on the Byrd case. (Tr. 57 (Crotty)).

Fuentes did not testify at the hearing. Instead, he relied on the statements set forth in his affidavit, submitted in support of his suppression motion. Those statements include that, after he opened the door of his apartment to the agents on March 20, 2007, several agents "pushed in the door and rushed into the house." (Fuentes Aff. ¶ 2). Then, according to

9

Fuentes, one agents said Fuentes should tell them what was in the apartment because, if he did not, "they were going to start breaking everything." (Fuentes Aff. ¶ 3). Fuentes states that he asked if the agents had a search warrant, to which they replied, "[w]e're feds, we can do whatever we want." (Fuentes Aff. ¶ 3). Finally, Fuentes concludes that he "never consented" to a search of his apartment. (Fuentes Aff. ¶ 4).

### Discussion

#### The Search Of Fuentes's Apartment Was Proper

**A.    Legal Standards**

The Fourth Amendment "generally requires police to secure a warrant before conducting a search" *Maryland* v. *Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*). Searches "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States*, 389 U.S. 347, 357 (1967).

However, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219 (1973). An "individual may consent to a search, thereby rendering it reasonable." *United States* v. *Garcia*, 56 F.3d 418, 422 (2d Cir.

1995).  "To ascertain whether consent is valid, courts examine the totality of the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Id.*

"Recent Supreme Court decisions emphasize . . . that the issue of reasonableness is to be measured by an objective standard."  *Id.*  In making that determination, courts ask "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Florida* v. *Jimeno*, 500 U.S. 248, 251 (1991) (quoting authority omitted). "[T]he ultimate question is whether 'the officer had a reasonable basis for believing that there had been consent to search.' "  *Garcia*, 56 F.3d at 423 (citing authority omitted).  Moreover, consent need not be expressed only verbally, it can also "be found from an individual's words, acts or conduct."  *Krause* v. *Penny*, 837 F.2d 595, 597 (2d Cir. 1988).

Some of the factors that bear upon the voluntariness of the search include "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent," *United States* v. *Lavan*, 10 F. Supp. 2d 377, 384

11

(S.D.N.Y. 1998) (citations omitted), as well as the personal characteristics of the defendant (such as age, education, and experience), *see United States* v. *Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990), and the length of detention and the nature of the questioning, *see United States* v. *Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988).

Although "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, it may be a factor in ascertaining whether the consent was coerced." *Garcia*, 56 F.3d at 423. In addition, consent is generally not voluntary if it is given only in acquiescence to a claim of lawful authority, and a claim by a law enforcement officer that he has a warrant, or can get one if necessary, can render consent involuntary. *See*, *e.g.*, *Bumper* v. *North Carolina*, 391 U.S. 543, 548-9 (1968); *United States* v. *Weidul*, 325 F.3d 50, 54 (1ˢᵗ Cir. 2003).

**B.    Fuentes Consented to the Search of His Apartment**

All of the circumstances of the agents' first encounter with Fuentes at the door to his apartment demonstrate the Fuentes gave his voluntary consent, and a reasonable person would have understood that, for the agents to enter and search his apartment for persons, guns or drugs. In addition, Fuentes's continuing statements and conduct throughout the agents' search indicates that Fuentes repeatedly consented to the search of his apartment

and that he did not seek to stop the search or limit its scope in
any way.

When Ricigliano and Tait first spoke with Fuentes at
the door to his apartment, Fuentes agreed to let the agents
inside and to speak with them. Moments later, when Ricigliano
asked Fuentes if there were other people, or "guns or drugs"
inside the apartment, Fuentes replied that there were not. When
Ricigliano then asked if they could look around, Fuentes
immediately agreed. From this exchange, a reasonable person
would have understood that the agents could search the apartment,
and that the consent for a search included at least guns and
drugs – the subjects of Ricigliano's question. Because "guns and
drugs" were the specific objects of Ricigliano's inquiry, and
because Fuentes agreed, without limitation, that the agents could
look around, it is reasonable for the agents to have understood
that they could look anywhere in the apartment where those items
could be found. *See United States* v. *Padilla*, 986 F. Supp. 163,
169 (S.D.N.Y. 1997) (SAS) (where defendant says to agents that
they can "look anywhere, you will see there is no drugs, there is
no guns" the defendant indicated consent to search the apartment
for guns and drugs).

Although this verbal exchange when the agents initially
entered the apartment was somewhat brief and informal, there are
no particular words or phrases that are required to communicate

13

consent. Here, Fuentes did not do or say anything indicating
that he hesitated before consenting to the search, he never
refused consent to search, and he did not place any limits on the
scope of the agents' search. Indeed, courts in this district
have found consent where the defendant's oral statements were
much less clear, for example, where an individual did not even
verbally indicate consent but only implicitly gave consent
through his actions. *See*, *e.g.*, *United States* v. *Carreno-Arias*,
2002 WL 31890949, *5 (S.D.N.Y. Dec. 27, 2002) (WHP) (defendant's
consent valid where agents asked if they could "look around" and
defendant opened door, let agents in, and did not object); *United
States* v. *Lee*, 1996 WL 391877, *3-4 (S.D.N.Y. July 12, 1996)
(RPP) (where defendant does not verbally indicate consent but
hands shopping bag to agents, defendant has given consent for
search of the shopping bag).

　　　　Nor does the fact that the agents did not ask Fuentes
for written consent change this result. "[I]t is of no
significance that [the defendant's] consent to search was oral
and not written." *United States* v. *Anderson*, 2005 WL 497778, *3
(S.D.N.Y. March 3, 2005) (JFK).

　　　　Moreover, after the initial conversation with
Ricigliano and Tait, at various times during the agents' search,
Fuentes repeatedly indicated his consent for the search of the
apartment. After Puri found the small bag of marijuana,

14

Ricigliano asked Fuentes again if there were any other items in
the apartment, to which Fuentes replied, "you can look wherever
you want, there's nothing in the apartment." In addition, when
Crotty first arrived and spoke with Fuentes, Fuentes told Crotty
that he had already given the other agents consent to look
around. In sum, Fuentes told at least three different agents
three times that they could search his apartment. Any one of
these exchanges, standing alone, would be sufficient to find that
Fuentes had consented to the search. Taken together, Fuentes's
consistent and repeated statements indicating his consent for the
search can leave no doubt that Fuentes consented to the search.

Not only did Fuentes agree to the search of his
apartment, but he also volunteered his car keys, told the agents
where his car was parked, and offered to let the agents search
his car. Fuentes's unprompted statement to the agents that they
could search his car is yet another indication that Fuentes
agreed to the agents' search, without hesitation or limitation.

Balanced against the sworn testimony of three witnesses
demonstrating that Fuentes consented to the entry and search of
his apartment, Fuentes provides only the written assertions in
his affidavit that the agents entered his apartment after they
"pushed in the door," that, once inside, they threatened to
"start breaking everything," and, in response to Fuentes's
question about whether they had a warrant, the agents replied

15

"[w]e're feds, we can do whatever we want." (Fuentes Aff. ¶¶ 2, 3). Fuentes then asserts that he "never consented to a search of his apartment." (Fuentes Aff. ¶ 4). This is not sufficient to defeat the strong evidence, in the form of live testimony, that Fuentes consented to the search. Where, as here, a defendant chooses not testify at a suppression hearing, the Court should credit the live testimony over the moving affidavit of the defendant. *See United States* v. *Al Marri*, 230 F. Supp. 2d 530, 538 (S.D.N.Y. 2002) (valuing live testimony "over the contents of a defendant's affidavit").

Moreover, the testimony of the three sworn agent witnesses was credible in all respects and consistent on all material issues. First, all three witnesses testified in a candid and straightforward manner. It is clear from their testimony that all three agents, who have each been employed in federal law enforcement for nine years or more, conducted the interview of Fuentes and the search of his apartment in a professional manner. None of the agents has any motive to testify less than credibly, particularly where, as here, the agents had not previously identified Fuentes as the target of any investigation, were not planning to arrest him that day, and at least two of the agents (Ricigliano and Tait) had no continuing role with respect to the investigation of Fuentes after the day of his arrest.

16

Fuentes attempts to show that the agents' testimony "contradicted" each other in material respects, particularly with regard to the chronology of the search. (See Fuentes Mem. at 20-23). However, the Government submits that the agents testified consistently on all material issues, including with regard to the chronology. For example, the agents testified that (i) the search took approximately 15 or 20 minutes while they were in the apartment for a total of one and a half to two hours; (ii) Ricigliano, Tait, and Obuchowski arrived at the apartment first; (iii) a group of agents, including Puri and others, arrived next; (iv) Crotty arrived after that; and (v) Vega gave her consent for the search after one box of ammunition and a small bag of marijuana were found, but before the loaded guns and other items were found. Fuentes attempts to make much out of the twenty minutes or so that passed before the guns were discovered, arguing that it is not credible that the agents "waited" to complete their search. However, all of the evidence shows that the agents did not begin searching the apartment immediately, and that the agents spent some time questioning Fuentes about the whereabouts of Darius Byrd. That is credible given the agents' primary goal that day - to find Darius Byrd who was a wanted fugitive.

The agents' credible and consistent testimony is directly contradicted by most of the material assertions in

17

Fuentes's affidavit.  Ricigliano and Tait testified that they did not "push" in the door to the apartment.  All three of the testifying agents who were present testified that they did not use any threats or threats of force, that they never threatened to start "breaking everything," and that they never said "we're feds, we can do whatever we want."  Thus, because the affidavit submitted by Fuentes was not subject to cross examination, and because the evidence at the hearing has proven that it is demonstrably false in material respects, the Court should give no weight to Fuentes's assertion that he did not consent to the search of his apartment.  Where, as here, the defendant's "conclusory statement" that he did "not consent" to the search is contradicted by all of the evidence at the hearing, it carries "little weight."  *United States* v. *Juliano*, 2000 WL 1206745, n.1 (S.D.N.Y. Aug. 24, 2000) (AGS).

Finally, at no point did Fuentes attempt to limit the scope of his consent, withdraw his consent, or change his mind about his consent for the agents' search.  Instead, all of the evidence is to the contrary.  Even once the agents began to search the apartment, and even after they found contraband, Fuentes continued to demonstrate, through his words and actions, his consent for the agents to search the apartment.

## C.  Vega Provided Additional Consent For The Search

Standing alone, Fuentes's repeated indications of

18

consent for the search are sufficient for the Court to find that the search is valid because Fuentes provided his voluntary consent.  However, Veronica Vega, Fuentes's common law wife and another occupant to the apartment, also gave her consent for the agents to search the apartment.  Thus, the agents' search was valid for the additional and independent reason of Vega's consent for the search.

The evidence is clear that Vega both gave her verbal consent for the agents to search the apartment and that she signed a written form further indicating her consent.  Vega herself admitted that, when asked by the agents if she had any problem signing a consent to search form, Vega replied, "no, I don't have a problem."  (Tr. 91 (Vega)).  After giving this oral consent, Vega subsequently signed the written form, and she testified that she read and understood the form before signing it.  (Tr. 91-93 (Vega); GX 1).

The issue raised by the defendant as to Vega's consent is that it occurred after the guns were already recovered.  The Government submits that the testimony of Crotty has established that Vega gave at least oral consent by the time that the guns were found.  Specifically, Crotty testified that he spoke with Vega in the hallway, and that during that conversation Vega was asked whether she would sign a consent form.  She agreed and this

19

constituted her verbal consent for the search.[4]  While another
agent was providing her with a written form, Crotty went back
inside the apartment.  At that point, the guns were found, and
Crotty returned back to the hallway area, to ask Vega to come
inside to take care of her daughter, to ensure that the child
would be safe.  Crotty's testimony about the chronology of events
is more credible than Vega's because it makes sense given this
context.  As soon as the guns were recovered, Crotty retrieved
Vega from the hallway to make sure that the guns would pose no
danger to her young daughter.  Consequently, the evidence
demonstrates that, in addition to Fuentes's repeated statements
of consent, Vega gave her oral and written consent for the
search.

However, even if the Court were to accept Vega's
version of the chronology of events as correct, the result
is the same.  Vega's consent was additional and on top of
Fuentes's earlier agreement that the agents could search the
apartment.  The agents' request for Vega's consent was merely a
belt-and-suspenders approach.  The agents had already obtained
valid consent from Fuentes for the search, but obtaining the
additional consent of Vega would ensure that she, another

---

[4] During this initial conversation, Vega was informed that
some ammunition and marijuana had already been found.  It is
possible that Vega is confused in her recollection that she had
been informed that the guns were found at that time because she
was in fact informed that ammunition had been found.

20

occupant to the apartment, had no objection to the ongoing search.

**D.    Fuentes's Consent Was Voluntary**

Not only did Fuentes give his repeated consent for the search of his apartment, but such consent was voluntary.  Nothing about Fuentes's age, intelligence, or manner should have led the agents to question the voluntariness of Fuentes's consent. Moreover, agents Ricigliano and Tait did not use any force, or show of force, to gain access to the apartment or get his consent to search.  They did not touch Fuentes, take out their guns, or threaten him in any way in order to gain access to the apartment. Nor did they tell Fuentes that they had warrants, or could get warrants, to get in.  Fuentes was not initially restrained in handcuffs until after he had given his consent for the search and after some contraband was found.  However, even where a defendant is formally in custody, the voluntariness of his consent is not necessarily negated on this basis. *See Garcia*, 56 F.3d at 423 (consent can be voluntary despite formal arrest, presence of multiple law enforcement officers, and handcuffing of defendant). Indeed, Fuentes has put forth no facts tending to show that his consent was not voluntary and he does not appear to be making that argument.

## CONCLUSION

For the reasons set forth above, the Court should deny Fuentes's motion to suppress physical evidence in its entirety and should find that all of the evidence recovered from the search of the apartment is admissible at trial.

Dated:      June 29, 2007
            New York, New York

                          Respectfully submitted,

                          MICHAEL J. GARCIA
                          United States Attorney


                    By:_____/s/_____
                          Jessica A. Masella
                          Assistant United States Attorney
                          Tel. No.: (212) 637-2288

22

## AFFIRMATION OF SERVICE

JESSICA A. MASELLA, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That, on June 29, 2007, I caused one copy of the within Government's Post-Hearing Memorandum of Law in Opposition to Defendant's Suppression Motion to be delivered by ECF and first class U.S. Mail to:

> Jonathan Marks
> 220 Fifth Avenue
> Suite 300
> New York, New York 10001

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:    New York, New York
          June 29, 2007


_____/s/_____
Jessica A. Masella