UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
UNITED STATES OF AMERICA,                  :     07 Cr. 329 (SHS)
                                           :
                                           :
            -against-                      :     OPINION
                                           :
                                           :
ELVIS FUENTES,                             :
                                           :
                        Defendant.         :
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

  Defendant Elvis Fuentes was indicted by a grand jury on April 19, 2007 and charged with distributing and possessing with intent to distribute marijuana in violation of 21 U.S.C. §§ 812, 841 and 18 U.S.C. § 2 (count one), possessing firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c) (count two), and possessing firearms while being an unlawful user of a controlled substance in violation of 18 U.S.C. § 922(g)(1) (count three).

  Fuentes now moves to suppress physical evidence seized from the apartment where he resided on March 20, 2007. He contends that the government's search of that apartment violated the Fourth Amendment to the U.S. Constitution because it was supported by neither a warrant nor an exception to the requirement that there be a warrant. The government maintains that the search was indeed conducted on the basis of an exception to the warrant requirement; namely, that both Fuentes and Veronica Vega, another resident of the apartment, consented to the search. Therefore, the prosecution contends, the search did not run afoul of the Constitution's prohibition on unreasonable searches and seizures.

An evidentiary hearing on Fuentes's motion was held on May 31, 2007, during which the Court heard testimony offered by the government from Deputy U.S. Marshals Nicholas Ricigliano and Dennis Tait and Special Agent Kenneth Crotty of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives. Veronica Vega testified for the defense. In addition, Fuentes and Vega had previously filed affidavits in support of this motion. Having considered the witnesses' testimony and exhibits and having reviewed the parties' submissions, the Court finds that Fuentes consented to the search of the apartment and therefore his suppression motion is denied.

## I. BACKGROUND

The following facts are either not in dispute or accepted as credible witness testimony from the suppression hearing.

On the morning of March 20, 2007, Nicholas Ricigliano, Dennis Tait, and Bart Obuchowski – three deputy United States marshals assigned to the New York/New Jersey Regional Fugitive Task Force – arrived at 282 East Gun Hill Road in the Bronx to interview Elvis Fuentes. (Transcript of Suppression Hearing at 4-7, 35-37.) The marshals were attempting to execute an arrest warrant for a fugitive named Darius Byrd and had received information that Fuentes might know where Byrd was. (Id. at 5-6, 36-37.)

Upon arriving at Fuentes's residence, the agents split up: Ricigliano and Tate knocked on the door of Fuentes's first-floor apartment, while Obuchowski monitored the windows and fire escape in the back of the building. (Id. at 7-8.) When Fuentes came to the door, Ricigliano identified himself as "police" and asked Fuentes to let him and marshal Tait into the apartment. (Id. at 8, 38.) Fuentes said, "Yeah, you can come into

2

the apartment." (Id. at 38.) As the marshals entered the apartment, Ricigliano asked Fuentes if anyone else was present, and Fuentes responded that only he and his daughter were at home. (Id.) Ricigliano then asked Fuentes specifically, "Are there any guns or drugs in the apartment?" (Id. at 9; see also id. at 38.) Fuentes replied "no," to which Ricigliano asked, "Are you sure?" and Fuentes answered, "Yes." (Id. at 9.) Ricigliano then asked, "Can we look around?" According to Ricigliano, Fuentes said, "Sure, go ahead," (id. at 9) and according to Tait, Fuentes responded, "No problem," (id. at 38-39).

Ricigliano and Tait then conducted a security sweep of the apartment, lasting approximately one minute, for "officer safety reasons" (id. at 10, 39), and afterwards asked to see Fuentes's cell phone (id. at 11, 43). Fuentes responded that it was in his car and gave his car keys to Obuchowski – who had just arrived at the apartment – saying, "You can go ahead and search [the car] if you want to." (Id. at 11, 43.) Ricigliano and Tait then questioned Fuentes about his relationship with Byrd and whether he knew where Byrd was. (Id. at 12, 40.)

"A few minutes" later, three or four additional U.S. marshals arrived at Fuentes's apartment (id. at 12, 40) and asked whether the apartment was "clear" (id. at 40), meaning whether "there was [any]body else in the apartment" (id.). Ricigliano responded that it was not clear (id.), and the marshals then conducted a more thorough security search of the apartment (id. at 12, 20, 40) in order to "make sure . . . that nobody was going to jump out of a closet or come out from a room and give us a problem" (id. at 40).

In the course of this search, one of the newly-arrived marshals – Manny Puri – found a bag of marijuana sitting on top of a bedroom dresser. (Id. at 13, 41.) Upon learning of the marijuana, Ricigliano placed Fuentes in handcuffs (id. at 14, 41) and told

3

him that he was under arrest for drug possession (id. at 14). Further searching of the apartment ensued, yielding two loaded handguns, several boxes of ammunition, and more marijuana, all within a hidden drawer concealed in the top molding of a bedroom dresser. (Id. at 14-15, 42, 62.)

At some point during this latter search, Veronica Vega – who lived in the apartment with Fuentes – and Kenneth Crotty – a special agent of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives – arrived separately at the apartment. (Id. at 15, 43-44.) Because the timing of Vega and Crotty's respective arrivals is a matter of some dispute, the Court will now review the relevant testimony on this issue.

Crotty testified that he arrived at the apartment fifteen to twenty minutes prior to Vega's arrival and, once there, interviewed Fuentes. (Id. at 60-61, 71-72.) According to Crotty, he later met Vega outside the apartment and obtained her consent – first oral and then written – to conduct a search of the apartment. (Id. at 62.) Crotty then claims to have left Vega as she was filling out the consent to search form, reentered the apartment, and shortly thereafter the guns and ammunition described above were located in the concealed dresser drawer. (Id. at 62-63.)

Vega testified to a different sequence of events. According to her testimony, she promptly returned to the apartment in response to a telephone call instructing her to come home and was briefly questioned about Darius Byrd upon her arrival. (Id. at 88.) She then learned that the marshals had discovered a "couple of guns and marijuana" in the apartment and that she could not enter until "the big guy" – later identified as Crotty – arrived. (Id. at 88-90.) According to Vega, Crotty arrived ten to fifteen minutes later and entered the apartment while Vega waited in the hallway. (Id. at 90.) Vega testified that

4

Crotty then returned to the hallway and at that time, another agent asked Vega to consent to the continued search of the apartment. (Id. at 91-92.) When Vega agreed, that agent handed her a consent form, which she signed, and she was then permitted to enter the apartment. (Id.)

The Court credits Vega's testimony and finds that Vega's consent to search the apartment was given after the guns and marijuana had already been found in the apartment. The Court reaches this determination in light of Vega's unequivocal recollection that she was told about the guns and marijuana prior to consenting to a search of the apartment. (See id. at 93.) In addition, the Court found Vega's demeanor at the hearing credible, and her testimony was both internally consistent and consistent with other testimony offered at the suppression hearing. Crotty's account was less certain (see id. at 80) and to some degree inconsistent with the sequence of events described by Tait and Ricigliano – neither of whom intimated that a fifteen to twenty minute gap occurred between the search that uncovered the marijuana on top of the dresser and the subsequent discovery of the guns – and further muddled by Crotty's report summarizing the March 20 search, which suggests that the guns, ammunition, and additional marijuana were implausibly discovered in the gap of time – a matter of mere minutes – between Vega's oral consent to search the apartment and the time when she signed the written consent form (see Exh. 3502-C). Accordingly, the Court finds that the two loaded handguns, several boxes of ammunition, and additional marijuana were discovered prior to Vega's arrival at the apartment and therefore prior to her consent to search the apartment.

After Vega signed the consent form, however, she entered the apartment and assisted the marshals with opening a locked safe discovered in a bedroom closet which

contained several boxes of ammunition. (Tr. at 15, 43-44, 65, 95-96.) Fuentes was subsequently taken to a New York City police precinct for processing. (Id. at 16, 44, 67.) On April 19, 2007, a grand jury returned the three-count indictment described above.

## II.   DISCUSSION

Fuentes now moves to suppress the physical evidence seized from his apartment during the March 20 search on the grounds that the search was conducted in violation of the Fourth Amendment because the government lacked a warrant and did not obtain sufficient consent for the search. The government concedes that no warrant authorized the search, but maintains that the evidence seized is admissible because Fuentes and Vega both consented to the search. Because the Court has found that Vega's consent was obtained after the contents of the dresser – the handguns, ammunition and marijuana – were discovered, her consent cannot have authorized that search. The admissibility of the evidence found in the dresser depends, therefore, on whether Fuentes earlier gave his voluntary consent to the search.

### A.   Standard

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are generally presumed to be unreasonable and therefore unconstitutional, but "the law recognizes certain exceptions to this rule." United States v. Newton, 369 F.3d 659, 665 (2d Cir. 2004). One such exception governs searches based on the voluntary consent of individuals authorized to grant consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 222, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973). If the government obtains consent to search, the ensuing search is thereby rendered reasonable and for that reason, will not run

afoul of the Fourth Amendment. United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).

For consent to be valid, it must be voluntary, i.e., the "'product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" Id. (quoting United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993)). The U.S. Court of Appeals for the Second Circuit has observed that "[s]o long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." Id.

To determine what government action was authorized by a suspect's consent, courts apply an objective test. "'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" Id. at 423 (quoting Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)). Pursuant to this standard, a court must consider the "totality of the circumstances" to determine whether it was "objectively reasonable for the officer to believe that the scope of the suspect's consent permitted" the challenged search. Id. (quoting Jimeno, 500 U.S. at 249) (internal quotation marks omitted). See also United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004) ("The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search.") (internal quotation marks omitted).

    B.    <u>Fuentes Voluntarily Consented to a Search of the Apartment.</u>

Fuentes denies that he voluntarily consented to the March 20 search and, in the alternative, maintains that the search exceeded the scope of any consent that was

obtained. The government contends that Fuentes consented to a search when he said "sure, go ahead" or "no problem" in response to Ricigliano's request to "look around" and that this consent encompassed a search for guns and drugs in the apartment. For the reasons discussed below, the Court finds that Fuentes did indeed voluntarily consent to a search of the apartment, the scope of which included the bedroom dresser drawer that was found to contain two handguns, ammunition, and marijuana. Accordingly, the government's search did not violate Fuentes's Fourth Amendment rights.

        *1.     The Government Obtained Fuentes's Voluntary Consent.*

In support of his claim that the government lacked voluntary consent for its search, Fuentes offers a sworn statement in which he writes that he "never consented to a search of [his] apartment." (Aff. of Elvis Fuentes dated May 1, 2007 ¶ 4.) Fuentes claims that the marshals "pushed in the door and rushed into" his apartment, threatened "to start breaking everything" and when challenged, told him that they "can do whatever [they] want." (Id. ¶¶ 2-3.) The Court does not accept Fuentes's version of events in light of the testimony at the suppression hearing. The Court finds the testimony of marshals Ricigliano and Tait on the issue of what they said to Fuentes and what he said to them forthright, consistent in all material respects and credible. Accordingly, the Court credits that, as set forth above, after Fuentes responded "yes" when asked whether he was "sure" that there were no guns or drugs in the apartment, Ricigliano asked whether the marshals could "look around" and Fuentes replied either "sure, go ahead" or "no problem."

      This Court is not the first to consider whether an affirmative response to a request to "look around" constitutes sufficient consent to satisfy the Fourth Amendment. At least four other nisi prius courts in this district have found that such an exchange provides an

8

adequate basis for a consensual search. See United States v. Camilo, 287 F. Supp. 2d 446, 448, 452 (S.D.N.Y. 2003) ("When asked whether the Marshals could come in to look around, [apartment resident] said that they could."); United States v. Kwan, No. 02 Cr. 241, 2003 U.S. Dist. LEXIS 8423, at *14-16 (S.D.N.Y. May 20, 2003) (The defendant "told the agents that they were welcome to ask [him] more questions and that they could look around and do whatever they have to do."); United States v. Jones, 154 F. Supp. 2d 617, 620-622 (S.D.N.Y. 2001) (An officer "asked if he and the other officers could 'look[] around,'" and defendant's mother "orally consented, stating that there 'was nothing to hide, nothing in the apartment, no drugs.'"); United States v. Aguirre-Parra, 763 F. Supp. 1220, 1224-27 (S.D.N.Y. 1991) (A special agent "asked if [defendant] minded if the agents looked around and [defendant] said 'No.'").

The circumstances of this case do not counsel a different determination. Fuentes granted Ricigliano and Tait permission to "look around" the apartment after the two had identified themselves as law enforcement officers and specifically asked twice whether guns or drugs were in the apartment. The Court finds that that permission, if voluntarily made, is reasonably construed as consent to conduct a search.

With respect to the question of voluntariness, there is no evidence that Fuentes's consent was the product of coercion. Fuentes was not in custody when he consented to Ricigliano's request, nor is there any evidence whatsoever in this record that he was subjected to threats or displays of force in order to extract that consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 228, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). The Court concludes, therefore, that Fuentes did consent to a search of the apartment and his consent was voluntary for Fourth Amendment purposes.

        2.      *The Scope of Fuentes's Consent Included Searching the Hidden Bedroom Dresser Drawer for Guns, Ammunition and Drugs.*

The Court now turns to the question of whether searching the hidden bedroom dresser drawer – where the guns, ammunition and drugs were found – fell within the scope of the search authorized by Fuentes's consent. Fuentes contends that it is unreasonable to conclude that his response to Ricigliano's request to "look around" amounted to anything more than consent to conduct a brief security sweep of the apartment. The Court disagrees. Upon entering the apartment, Ricigliano asked Fuentes whether anyone else was at home and then whether any guns or drugs were present. When Fuentes answered that there were no guns or drugs in the apartment, Ricigliano asked whether he was sure, and Fuentes responded affirmatively. Ricigliano then asked whether he could "look around" and Fuentes answered either "sure, go ahead" or "no problem." Ricigliano testified that he understood Fuentes's response to constitute consent to search the apartment for guns and drugs. (Tr. 13.) Under the circumstances of this case, the Court finds that it was objectively reasonable for Ricigliano to have reached that conclusion.

It is significant that Ricigliano's request to search came immediately after his inquiries about the presence of guns and drugs in the apartment. A reasonable officer would expect that a request to "look around" immediately following his inquires about specific items would alert a suspect that the officer intended to "look around" for those very items, particularly in places where those items might be hidden. Here, it was reasonable to assume that Fuentes understood Ricigliano's request to look around, which immediately followed his questions about guns and drugs, as a request to look around for

10

guns and drugs. It was also reasonable for Ricigliano to construe Fuentes's response as consent to engage in such a search.

That this search was conducted in multiple stages and by multiple agents is of no moment, because the objective reasonableness of the marshals' belief that Fuentes had consented to a government search of the apartment for guns and drugs was not undermined by subsequent events. Fuentes was present for the duration of the search and never once objected to the search or otherwise attempted to limit its scope. (Tr. 16-17, 44-45, 67-68.) Indeed, Fuentes voluntarily expanded the scope of the search by handing his car keys to Deputy Marshal Obuchowski and telling him that he could search the car if he wanted to. Thus, events subsequent to his oral consent served only to reinforce the reasonableness of the marshals' belief that Fuentes had authorized a search of the apartment for guns and drugs.

In support of limiting the scope of his consent, Fuentes relies on Second Circuit precedent rejecting broad police authority to engage in "protective sweeps" upon obtaining consent to enter a dwelling. See United States v. Gandia, 424 F.3d 255, 261-264 (2d Cir. 2005). This authority, however, does not speak to the issues raised by Fuentes's motion. Here, the search is not justified on the basis of consent to enter the apartment and a resulting security sweep, but on the basis of consent to search the apartment for contraband, specifically "guns or drugs." (Tr. at 9.) As a result, the Second Circuit's requirement that safety sweeps "be conducted only when justified by a reasonable, articulable suspicion," id. at 264, has no bearing on the scope of Fuentes's consent to search the apartment for contraband.

11

Under the circumstances of this case, the Court finds that it was objectively reasonable for the marshals to believe that the scope of Fuentes's consent permitted the search of the apartment for guns and drugs, including any guns or drugs hidden in the bedroom dresser.

### III.  CONCLUSION

Because the Court finds that Fuentes voluntarily consented to the March 20, 2007 search of the apartment, defendant's motion to suppress the evidence obtained in the course of that search is denied.

Dated: New York, New York
August 10, 2007

_____
Sidney H. Stein, U.S.D.J.